1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT FOR THE

9                  EASTERN DISTRICT OF CALIFORNIA

10

11   THE MEAT MARKET, INC., dba          )    1:11-cv-00983-AWI-SAB
     STATE CENTER FOODS,                 )
12                                       )    ORDER RE: MOTION FOR
                     Plaintiff,          )    SUMMARY JUDGMENT OR
13                                       )    SUMMARY ADJUDICATION
            v.                           )
14                                       )    (Doc. 28)
     THE AMERICAN INSURANCE CO.;         )
15   and DOES 1 through 50, inclusive,   )
                                         )
16                   Defendants.         )
                                         )
17   _____)

18
19                          **I. INTRODUCTION**

20
21   Defendant The American Insurance Company (hereinafter referred to as "Defendant" or "AIC") has

22   filed a motion for summary judgment or summary adjudication in the alternative pursuant to Federal

23   Rule of Civil Procedure 56.  For reasons discussed below, the motion shall be denied.

24
25              **II. FACTS AND PROCEDURAL BACKGROUND**

26
27   On April 15, 2011, plaintiff The Meat Market, Inc., dba State Center Foods (hereinafter referred to

28   as "Plaintiff" or "Meat Market") filed its complaint in Fresno County Superior Court against AIC

and Does 1 through 50, inclusive, asserting causes of action for breach of contract and breach of the

implied covenant of good faith and fair dealing.  In the complaint, Meat Market alleged as follows:

> "Prior to April, 2009, plaintiff, MEAT MARKET, was insured under a commercial policy and endorsements issued by defendant which included perishable stock and equipment breakdown coverage for plaintiff's business property and perishable stock, including wine merchandise, retained in storage at MEAT MARKET's facility located at 454 West Alluvial, Fresno, California.  Said policy and endorsements shall hereinafter be referred to collectively as 'THE POLICY.' "

Meat Market further alleged:

> "In late April, 2009, MEAT MARKET began experiencing mechanical problems with the refrigeration system that maintained controlled temperature for a storage container holding plaintiff's vintage wine collection at 454 West Alluvial, Fresno, California.  Plaintiff accordingly contacted Valley Transportation Refrigeration ('VTR') to inspect and evaluate the problems with the refrigeration system.  It was determined by VTR that the refrigeration system was not properly cooling the container due to a breakdown of the system's microprocessor.  Because of the breakdown of the microprocessor, it was removed for repairs and a new microprocessor was ordered. [¶] On or about May 5, 2009, VTR received and installed the replacement microprocessor.  At that time, the VTR mechanic performed a comprehensive check of the refrigeration system, and found that the unit had shut down under high pressure.  The mechanic found that another component part of the refrigeration system, a rectifier, had malfunctioned, and a replacement rectifier was installed at that time."

Meat Market further alleged:

> "During the time frame that the refrigeration system's microprocessor was malfunctioning, the wine in the storage container was exposed to varying temperatures; once the microprocessor was removed, malfunction occurred to associated and inter-related component parts of the refrigeration system, exposing the wine to high temperatures.  These temperature changes resulted in degradation of the corks in the wine bottles, and irreparable damage to a substantial portion of plaintiff's vintage wine collection, valued in excess of $570,000.00."

Meat Market further alleged:

> "Shortly after the loss, plaintiff notified [AIC] of the damages. [AIC] conducted a purported investigation and subsequently issued contradictory reports concluding that (1) the damage to plaintiff's perishable stock was not caused by a mechanical breakdown of the covered equipment; and (2) there was a mechanical breakdown but plaintiff had not properly mitigated its loss by protecting the product. [AIC] has denied plaintiff's claim for damage to its perishable wine stock under THE POLICY based on an asserted position that there is no causal connection between the mechanical breakdown of the refrigeration system, and plaintiff's damages."

Meat Market further alleged:

> "Under the express terms of THE POLICY, [AIC] is obligated to pay for the losses

plaintiff suffered as a result of the mechanical breakdown of the refrigeration system for its wine storage unit. [¶] Despite MEAT MARKET's repeated requests that [AIC] comply with its contractual, legal, statutory and regulatory duties to provide plaintiff with the full and complete benefits to which plaintiff was and is entitled to under THE POLICY, [AIC] has repeatedly and continuously refused to comply with its obligations. Instead, [AIC] has engaged in conduct designed to harass, annoy, injure and otherwise frustrate plaintiff by unreasonably denying plaintiff's covered claim, in the hopes that plaintiff would abandon its claim and thereby allow [AIC] to profit from its improper, unreasonable and illegal conduct."

On June 14, 2011, AIC removed the action to this Court pursuant to 28 U.S.C. § 1332. On January 25, 2013, AIC filed a motion for summary judgment or summary adjudication in the alternative pursuant to Federal Rule of Civil Procedure 56, contending there are no triable issues of material fact and AIC is entitled to judgment as a matter of law. On February 11, 2013, Meat Market filed its opposition to the motion. AIC filed its reply to Meat Market's opposition on February 18, 2013.

### III. LEGAL STANDARDS

*A. Standard for summary judgment –* "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325). If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material

1   fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct.

2   1348, 89 L.Ed.2d 538.  A court ruling on a motion for summary judgment must construe all facts and

3   inferences in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,*

4   477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Even if the motion is unopposed, the

5   movant is not absolved of the burden to show there are no genuine issues of material fact, *Henry v.*

6   *Gill Industries, Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the

7   movant's assertions of fact to be undisputed and grant summary judgment if the facts and other

8   supporting materials show the movant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2), (3).

9

10  ***B. Principles of contract interpretation applied to insurance policies*** – "[I]nterpretation of an

11  insurance policy is a question of law," and "[w]hile insurance contracts have special features, they

12  are still contracts to which the ordinary rules of contractual interpretation apply."  *Palmer v. Truck*

13  *Ins. Exchange,* 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568 (1999) (internal citations

14  and quotations omitted). " 'The fundamental rules of contract interpretation are based on the premise

15  that the interpretation of a contract must give effect to the "mutual intention" of the parties.  "Under

16  statutory rules of contract interpretation, the mutual intention of the parties at the time the contract

17  is formed governs interpretation.  Such intent is to be inferred, if possible, solely from the written

18  provisions of the contract.  The 'clear and explicit' meaning of these provisions, interpreted in their

19  'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning

20  is given to them by usage,' controls judicial interpretation." ' " *Ameron Intern. Corp. v. Insurance*

21  *Co. of State of Pennsylvania,* 50 Cal.4th 1370, 1377-78, 118 Cal.Rptr.3d 95, 242 P.3d 1020 (2010)

22  (quoting *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.3d 370, 900 P.2d 619

23  (1995)) (internal citations omitted).  Accordingly, " '[the court's] goal in construing insurance

24  contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.]

25  "If [the] language [of the policy] is clear and explicit, it governs." [Citations.]' " *Minkler v. Safeco*

26  *Ins. Co. of America,* 49 Cal.4th 315, 321, 110 Cal.Rptr.3d 612, 232 P.3d 612 (2010).

27

28                                                          4

If the terms of an insurance policy are not clear and explicit, but "susceptible of two or more reasonable constructions," they are ambiguous. *Ameron Intern. Corp., supra,* 50 Cal.4th at 1378. " 'If the terms are ambiguous . . . , [courts] interpret them to protect " 'the objectively reasonable expectations of the insured.' " Only if these rules do not resolve a claimed ambiguity do [courts] resort to the rule that ambiguities are to be resolved against the insurer." *Minkler, supra,* 49 Cal.4th at 321 (internal citations omitted). "To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer." *Id.* at 322. "[An] exclusionary clause must be ' "conspicuous, plain and clear." ' [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.' [Citation.]" *Palp, Inc. v. Williamsburg Nat. Ins. Co.,* 200 Cal.App.4th 282, 290, 132 Cal.Rptr.3d 592 (2011).

"The insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion. To prevail, the insurer must establish its interpretation of the policy is the only reasonable one. Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim." *Palp, supra,* at 200 Cal.App.4th at 290; *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) ("To prevail, the insured must prove the existence of a *potential* for coverage, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*").

## IV. DISCUSSION

The evidence shows the following undisputed facts. Meat Market, located at 454 West Alluvial in

Fresno, California, operates primarily as a wholesaler and retailer of meat products and wine. Its owner is Jeff Aivazian. From January 15, 2009 to January 15, 2010, Meat Market was insured under a policy (#MZX80900577) issued by AIC. The policy provided commercial property coverage subject to the terms and conditions of Property-Gard Building and Personal Property Coverage Form 142000 12-88 as modified by various endorsements, including Property-Gard Equipment Breakdown Coverage Endorsement Form 143609 07-03; the Equipment Breakdown Coverage Endorsement was reinsured by the Hartford Steam Boiler Inspection and Insurance Company ("HSB"). Both parties agree that when the policy was written, it was designed to cover Meat Market's wine merchandise.

In the parking lot of Meat Market's West Alluvial premises is a refrigeration unit used for storing wine. The refrigeration unit consists of a shipping container with an attached refrigeration system designed to provide a controlled environment for the container's contents. The refrigeration system is set to maintain a temperature range of $55°F$ to $57°F$ inside the container. Temperature read-outs for the interior of the container are located directly on the system itself. An additional remote temperature read-out, connected by hard wires to a thermometer in the container, sits in Aivazian's office inside Meat Market. Meat Market stored 3,597 bottles of vintage wine in the unit.

In April 2009, Aivazian noticed the temperature inside the container fluctuating between $50°F$ and $60°F$, outside the normal temperature range. Aivazian then contacted Valley Transport Refrigeration ("VTR") to inspect the refrigeration system. VTR sells, services and repairs transport refrigeration units. On April 30, 2009, VTR technician Mario Reyes, who specializes in repairing the type of refrigeration unit used by Meat Market, inspected the refrigeration system. Reyes determined there was a problem with the system's micro control unit and removed it. VTR then sent the control unit to Refrigeration Transport Electronics ("RTE") in New York to be repaired. The evaporator fans inside the storage container were left running while the control unit was removed. On May 5, 2009, VTR received the repaired control unit from RTE and reinstalled it into the system.

On June 24, 2009, Aivazian notified AIC of damage to the wine in the container and made a claim under the policy. In particular, Aivazian reported to AIC he observed wine corks pushing

6

out and wine leaking, which he believed was evidence of extreme heat.  Because Aivazian's report indicated the loss might have been caused by a malfunction in the refrigeration system, potentially implicating coverage under the Equipment Breakdown Coverage Endorsement, AIC contacted HSB to participate in the investigation of the claim.  After conducting an investigation, AIC denied Aivazian's claim.  AIC now contends summary judgment must be granted because Meat Market cannot meet its burden of establishing the claim falls within the scope of coverage under the policy.

As a threshold matter, AIC contends Meat Market cannot meet its burden to show coverage under Property-Gard Building and Personal Property Coverage Form 142000 12-88 ("Form 142000").  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court is compelled to agree.  Form 142000 provides in pertinent part, "We will pay for direct physical loss of or damage to Covered Property at the location described in the Declarations caused by or resulting from any Covered Cause of Loss."  The parties do not dispute Meat Market's wine merchandise is covered property.  However, it is clear under any reasonable interpretation of the policy that the loss in this case could not have resulted from a "covered cause of loss."  The Cause of Loss Form (Form 141035 12-88) applicable to all commercial property coverages under the policy, including Form 142000, provides that the causes of loss covered by the policy are either "basic" or "special."  Basic causes of loss refer exclusively to fire, lightning, explosion, windstorm or hail, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sprinkler leakage, sinkhole collapse or volcanic action – none of which could conceivably have applied here.  Special causes of loss refer to both (1) basic causes of loss and (2) risks of direct physical loss not covered by basic causes of loss, but only if such loss is not expressly excluded or limited by the provisions of the special cause of loss form ("special form").  Problematically for Meat Market, the special form contains an exclusion that provides in pertinent part as follows: "B. **Exclusions** [¶] We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. [¶] . . . [¶] (8) The following causes of loss to personal

7

property: [¶] . . . [¶] (b) *Changes in or extremes of temperature*[.]"  (Bold original, emphasis added.)
Meat Market's position is its wine spoiled because it was exposed to extreme temperatures while the
refrigeration system's control unit was being serviced.  Even engaging in inferences most favorable
to Meat Market, this cause of the wine's loss is clearly encompassed by the special form exclusion.

In its opposition, Meat Market does not contend there was a potential for coverage under
Form 142000 and the Cause of Loss Form.  Instead, Meat Market argues the loss was caused by a
problem with the refrigeration system and was therefore covered under the policy's Property-Gard
Equipment Breakdown Coverage Endorsement Form 143609 07-03 ("Form 143609").  Naturally,
AIC contends summary judgment must be granted because Meat Market cannot show a potential for
coverage under Form 143609.  Form 143609 provides in pertinent part, "1. We will pay for direct
physical loss or damage to property covered by this policy caused by an **equipment breakdown** to
**covered equipment**."  (Bold original.)  Form 143609 further provides, "2. Perishable Stock [¶] a.
We will pay for the following loss, damage and expense that is caused by an **equipment breakdown**
to **covered equipment**: [¶] (1) your loss of **perishable stock** due to spoilage; [¶] . . . [¶] (c) The most
we will pay for loss of **perishable** stock, including necessary expense you incur to reduce loss, is
$25,000, unless otherwise shown in the Schedule of **Equipment Breakdown** Coverage Limits."
(Bold original.) Form 143609 defines equipment breakdown to mean direct physical loss as follows:

> "a. Artificially generated electric current, including electric arcing, that disturbs
> electrical devices, appliances or wires; [¶] b. Explosion of steam boilers, steam
> piping, steam engines or steam turbines owned or leased by you, or operated under
> your control; [¶] c. Loss or damage to steam boilers, steam pipes, steam engines or
> steam turbines caused by or resulting from any condition inside such equipment; [¶]
> d. Loss or damage to hot water boilers or other water heating equipment caused by
> or resulting from any condition inside such boilers or equipment; [¶] e. Mechanical
> breakdown, including rupture or bursting caused by centrifugal force."

AIC concedes wine is perishable stock and that the refrigeration system is covered equipment, but
argues no evidence exists to suggest some sort of equipment breakdown within one of the five listed
types above caused Meat Market's wine to spoil.  Having reviewed the pleadings of record and all
competent and admissible evidence submitted, the Court does not agree.  The Court finds there is,
at the very least, a genuine issue whether the loss of the wine was caused by mechanical breakdown.

8

It should first be noted the mechanical breakdown endorsement in Form 143609 appears to supersede language in Form 141035 that excludes coverage for mechanical breakdowns.  Form 143609 does not define mechanical breakdown, but Form 141035 does: "[**M**]**echanical breakdown** means any breakdown of a machine caused by or resulting from: [¶] a. any condition or event within the machine; [¶] b. any part of the machine which interrupts the machine's intended or designed function or operation; or [¶] c. any rupture or bursting caused by centrifugal force." (Bold original.)

As support for the contention Meat Market's loss could not have resulted from a mechanical breakdown, AIC points to evidence establishing the following.  By all indications, the wine was in good and salable condition before Aivazian first observed temperature fluctuations inside the container, and although he observed temperatures ranging from 50°F to 60°F, those temperatures were within industry standards for wine storage and were not excessive enough to have caused the wine to spoil.  As noted above, the control unit was subsequently determined to be defective and removed for repair.  During the five days the control unit was removed (April 30, 2009 to May 5, 2009) , the cooling aspect of the refrigeration system did not operate.  When VTR reinstalled the repaired control unit on May 5, 2009, the temperature was noted to be 99.9°F, which both parties agree would, if prolonged, have been more than sufficient to destroy the wine.  One or two hours after the control unit was reinstalled, the temperature returned to its normal range of 55°F to 57°F. From this, AIC contends the extreme temperature (and, by extension, the loss of the wine) occurred not because the control unit was malfunctioning but because Meat Market voluntarily removed the control unit, deactivating the refrigeration system.  Stated differently, AIC contends the loss of the wine was necessarily of Meat Market's own making, as opposed to any breakdown in the system.

Not so.  First, the evidence shows Meat Market was required to remove the control unit and ship it out for repairs because the age and style of the control unit were so old no replacement control units were available.  In light of this evidence, AIC essentially suggests that, despite having already determined a component in the refrigeration system was malfunctioning, Meat Market was obligated to sit and wait for the system to completely fail (instead of performing an emergent repair of the

9

malfunctioning component, as it did) in order to protect its rights as an insured.  AIC has provided no authority – and the Court's research reveals no authority – to support this proposition.  AIC's argument also presupposes, of course, that the temperature in the storage container increased significantly once the control unit was removed.  Problematically for AIC, evidence further suggests the temperature did not increase sufficiently enough to spoil the wine even with the control unit removed.  AIC's own evidence shows Aivazian monitored the container's temperature between the time the control unit was removed and the time it was reinstalled but did not see any readings that caused him to be concerned about the wine; the highest temperature he observed was in the upper 70s.  Based on this evidence, a reasonable trier of fact could conclude the temperature in the container reached 99.9°F irrespective of any issue with the control unit, and that this temperature was attributable not to the removal of the unit, as AIC contends, but to a problem with another, unidentified component in the refrigeration system.  The mere presence of an unexplained failure with the system would by itself be sufficient to trigger the potential for coverage under the policy.

AIC further suggests summary judgment should be granted because Meat Market failed to mitigate damages while the refrigeration system was down, either by taking action to maintain acceptable temperatures or relocating the wine to another storage unit.  AIC provides no argument or evidence, however, to suggest Meat Market's alleged failure to mitigate would preclude a finding of liability as a matter of law.  Under these circumstances, proof of a failure to mitigate would serve simply as a basis for a reduction of damages, not summary judgment.  Moreover, proof of such failure depends on the reasonableness of a party's actions, *see Green v. Smith,* 261 Cal.App.2d 392, 396, 67 Cal.Rptr. 796 (1968) ("[a] plaintiff cannot be compensated for damages which he could have avoided by reasonable effort or expenditures"), and whether a party acted reasonably to mitigate damages is generally a question of fact for the jury.  *See Jegen v. Berger,* 77 Cal.App.2d 1, 11, 174 P.2d 489 (1946).  In the Court's view this is particularly true given what the evidence shows here.  Aivazian did not enter the storage unit between April 30, 2009 – the day the control unit was removed – and June 20, 2009.  In addition, while it appears Aivazian was aware the temperatures

in the unit had begun to fluctuate and that, once the control unit was removed, the cooling portion of the refrigeration system would not operate, nothing suggests Aivazian knew or should have known the temperature in the unit would get hot enough to spoil the wine.  Thus, even if the Court were to accept AIC's contention the extreme temperatures in the unit were caused solely by the removal of the control unit, whether Aivazian should have done anything differently than he did is debatable.

In the alternative, AIC contends summary adjudication of the second cause of action for breach of the implied covenant of good faith and fair dealing (i.e., bad faith) should be granted because the existence of a genuine dispute over coverage precludes a bad faith claim as a matter of law.  "To establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding benefits was unreasonable or without proper cause." *Century Sur. Co. v. Polisso,* 139 Cal.App.4th 922, 949, 43 Cal.Rptr.3d 468 (2006).  Under California's genuine dispute doctrine, " 'an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract.' " *Wilson v. 21st Century Ins. Co.,* 42 Cal.4th 713, 723, 68 Cal.Rptr.3d 746, 171 P.3d 1082 (2007) (quoting *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.,* 90 Cal.App.4th 335, 347, 108 Cal.Rptr.2d 776 (2001) (*Chateau Chamberay*)).  However, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." *Wilson, supra,* 42 Cal.4th at 723.  "A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Id*. (emphasis omitted).  Consequently, when an insurer unreasonably withholds payment of its insured's claim, it breaches the implied covenant of good faith and fair dealing. *See Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 818-19, 169 Cal.Rptr. 691, 620 P.2d 141 (1979).  "[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Amadeo v. Principal Mut. Life Ins. Co.,* 290 F.3d 1152, 1162 (9th Cir. 2002)

11

1   (citing *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980, 985 (1978)).

2       Here, it would be inappropriate to grant summary adjudication on the basis of a genuine

3   dispute because the evidence, when viewed in a light most favorable to Meat Market, could support

4   a finding AIC acted unreasonably by conducting a biased investigation.   There are "several

5   circumstances where a biased investigation claim should go to the jury: (1) the insurer was guilty of

6   misrepresenting the nature of the investigatory proceedings [citation]; (2) the insurer's employees

7   lied during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the

8   insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation."

9   *Chateau Chamberay, supra,* 90 Cal.App.4th at 348-49 (citing *Guebara v. Allstate Ins. Co.,* 237 F.3d

10  987, 996 (9th Cir. 2001)).   It appears from the record AIC may, at the very least, have failed to

11  conduct a thorough investigation.   The October 5, 2009 report prepared by HSB pursuant to its

12  investigation with AIC contains errors even AIC concedes.   For example, the report states the VTR

13  service technician (presumably in reference to Reyes) was contacted by Meat Market on or before

14  June 2, 2009 and removed the control unit thereafter (when in fact it was April 30, 2009); that the

15  technician could not identify the problem with the refrigeration system (when in fact all other

16  evidence confirms Reyes diagnosed a problem with the control unit); and that the control unit was

17  not reinstalled until June 25, 2009 (when in fact it was May 5, 2009).   The report further provides:

18      "We contacted the service technician to see if service technician to see if any of the
        old parts were available to look at.   The service technician advises that none of the
19      old parts are available for our inspection.   Because the parts are not available we are
        unable to determine if the problem with the refrigeration control unit suffered an
20      Equipment Breakdown, as defined, in the policy. [¶]   Since we are unable to
        determine if an Equipment Breakdown has occurred we must respectfully disclaim
21      any and all liability associated with this occurrence.   If the insured or their repair
        concern can supply us with the old parts we would be more than happy to reopen our
22      investigation into this matter."

23  In the Court's view, the errors in the report coupled with the language suggesting HSB ended its

24  investigation after concluding it was impossible to determine whether an equipment breakdown

25  occurred simply because it did not have to opportunity to inspect any of the old components could

26  lead a reasonable trier of fact to conclude the investigation was less than thorough.   In a subsequent

27

28                                                    12

report dated October 30, 2009, HSB acknowledges the VTR technician had documented a temperature of 99.9°F showing on the main control panel upon startup of the refrigeration system on May 5, 2009, but states its consultant did not believe that was the actual temperature. However, no explanation is given for the consultant's belief. The report then concludes the 99.9°F reading "was most likely a default reading while the system was coming back on line," but provides no reasoning to underlie this conclusion other than to state, "This seems to be confirmed with the fact that the Insured from his office gauge did not see an increase in temperature that caused him concern with the stored product." In the Court's view, the foregoing is hardly the type of conclusion that would be reached by a thorough investigation, especially in the absence of any evidence to suggest the temperatures Aivazian was witnessing were extreme enough to cause the wine to spoil. And while a reasonable trier of fact might, like HSB, conclude the discrepancy between the 99.9°F reading on the control panel and the upper 70s readings on the thermometer in Aivazian's office was indicative of nothing more than that the 99.9°F reading was simply a "default reading," a reasonable trier of fact could also view the discrepancy as being probative of some sort of problem in the functioning or operation – i.e., a mechanical breakdown – of the refrigeration system. Accordingly, summary adjudication cannot be granted for the bad faith claim on the basis of a genuine dispute.

Lastly, AIC contends Meat Market's punitive damages claim fails as a matter of law because there is no evidence of any malice, oppression or fraud by AIC. California Civil Code § 3294 provides "in an action for the breach of an obligation not arising from contract," including in, as here, bad faith insurance actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code, § 3294, subd. (a). Meat Market is entitled to recover punitive damages "if [it] can prove that [AIC] not only denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so, was guilty of malice, oppression or fraud." *Jordan v. Allstate Ins. Co.,* 148 Cal.App.4th 1062, 1080, 56 Cal.Rptr.3d 312 (2007). The Court has already concluded that

13

a reasonable trier of fact could find AIC engaged in bad faith by conducting a biased investigation of Meat Market's claim.  A trier of fact could further find AIC, in doing so, was guilty of oppression – that is, "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights," Cal. Civ. Code, § 3294, subd. (c)(2) – because its refusal to pay policy benefits would have caused Aivazian and Meat Market to be liable for costs attributable to the loss of the wine, all in contravention of Meat Market's reasonable expectations of coverage under the policy.  Accordingly, summary adjudication of the punitive damages claim cannot be granted.

## V. DISPOSITION

Based on the foregoing, AIC's motion for summary judgment or summary adjudication in the alternative is hereby DENIED.  All future dates remain.

IT IS SO ORDERED.

Dated:     March 19, 2013

_____
SENIOR  DISTRICT  JUDGE

14